Filed 1/26/21  In re H.T. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re H.T., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D077619 |
| Plaintiff and Respondent, | (Super. Ct. No. EJ4381D) |
| v. | |
| Ha.T. et al., | |
| Defendants and Appellants. | |

APPEALS from orders of the Superior Court of San Diego County, Gary M. Bubis, Judge.  Affirmed.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant A.T.

Megan Turkat-Schirn, under appointment by the Court of Appeal, for Defendant and Appellant Ha.T.

Thomas E. Montgomery, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

1

Ha.T. (Mother) and A.T. (Father) appeal orders of the juvenile court finding it had jurisdiction over their infant son, H.T., pursuant to Welfare and Institutions Code section 300, subdivision (a),[1] and then adopting a family maintenance plan that required Mother to undergo a psychological evaluation.

Mother ran a daycare business providing care for infants and young children. Y.M., a seven-month-old boy, suffered nonaccidental life-threatening injuries while in Mother's care. The San Diego County Health and Human Services Agency (Agency) filed a section 300, subdivision (a) petition alleging that H.T., then 16-months-old, was at substantial risk of serious physical harm because Mother had inflicted those severe injuries on Y.M. according to the opinion of a child abuse medical expert. At the contested jurisdiction and disposition hearing, the court found the petition's allegations to be true, declared H.T. to be a dependent of the court, and placed him with his parents. Given Mother's continued denial that she caused Y.M.'s injuries despite compelling evidence to the contrary, the court then issued a dispositional order requiring Mother to undergo a psychological evaluation.

Mother and Father each filed a notice of appeal, challenging the court's jurisdictional and dispositional order. On appeal, they contend: (1) there is insufficient evidence to support the court's jurisdictional order; and (2) the court abused its discretion by issuing a dispositional order requiring Mother to undergo a psychological evaluation. As we explain *post,* we conclude the court did not err.

---

1      All statutory references are to the Welfare and Institutions Code.

FACTUAL AND PROCEDURAL BACKGROUND

In March 2019, Mother and Father had been married for 14 years and were parents to H.T., then 16 months old, and three older children.[2] After receiving a bachelor's degree in early childhood development and previously working as a preschool teacher at a child development center for nine years, Mother opened, and had been operating for four years, a daycare for children in their home. Father assisted Mother with the daycare, distributing lunches to the children and transporting them to and from school.

At about 7:00 a.m. on March 14, 2019, Y.M., then seven months old, was dropped off by his parents at Mother's daycare.[3] According to his parents and Mother, Y.M. was asleep when he was dropped off and appeared to be well at that time. When Y.M. awoke about 8:00 a.m., he was quiet and not hungry. Mother nevertheless was able to feed him some food and breast milk. At about 9:00 a.m., Mother took a photograph of Y.M., sitting in a "bumbo" chair, and sent the photograph to his mother. According to Mother, Y.M. took about a two-hour nap and apparently awoke between 12:00 p.m. and 2:00 p.m. Again, he was not hungry and consumed only a small amount of breast milk.

At about 2:45 p.m., Y.M. began having seizures. Mother grabbed him from behind to prevent him from falling forward. She saw liquid coming from his mouth and his eyes had rolled down. His body was jerking and he was

---

[2]    Mother immigrated to the United States from Sierra Leone, and Father immigrated to the United States from Ghana where he had sought refuge for four years after previously living in Sierra Leone. They met while living in the United States.

[3]    Mother had been Y.M.'s daycare provider since he was two months old.

3

breathing hard.  She called 911 and paramedics arrived and took Y.M. to the hospital.[4]

Dr. Shalon Nienow, a child abuse pediatrician, examined Y.M. and reviewed his medical records and found no medical cause for his seizures, but tests showed he had head trauma that was nonaccidentally inflicted.  Y.M. also had suffered a skull fracture, vertebral fractures, intracranial hemorrhages, retinal hemorrhages, and brain edema, which injuries were nearly fatal and would have been immediately symptomatic, such that regular caregivers would have known something was wrong.

On April 9, the Agency filed a section 300, subdivision (a) dependency petition, alleging that there was a substantial risk that H.T. would suffer serious physical harm inflicted nonaccidentally by his parents.[5]  In support of the petition, the Agency cited the March 14 incident and Y.M.'s near-fatal injuries.

In its detention report, the Agency described the March 14 incident and the serious, near-fatal injuries that Y.M. sustained nonaccidentally while in Mother's care.  It also reported that Dr. Nienow stated it was highly likely that Mother was the perpetrator of Y.M.'s injuries because his injuries would have been immediately symptomatic while in her care that day such that a regular caregiver would have known something was wrong with him.  Mother denied that Y.M. had suffered any falls or injuries while at her home.  She denied physically disciplining or abusing any of her daycare children.  Mother claimed that Y.M.'s mother had previously told her that Y.M.'s father had

---

[4]   At that time, Father was picking up children from school and therefore was not at home.  Father only learned about the incident afterward from Mother and then called Y.M.'s parents to inform them about it.

[5]   The Agency also filed similar petitions for H.T.'s three older siblings.

4

dropped Y.M. sometime between February 14, 2019 and February 18, 2019, and Y.M. was taken to the hospital, but his mother told her it was not that bad. When Y.M. returned to daycare on February 21, Mother did not observe any bumps or scratches on Y.M. Although Father stated he was not home at the time of the March 14 incident, he denied Y.M. had suffered any falls or injuries while at their home. He denied physically disciplining or abusing their children or any of the daycare children. The Agency also stated that there had been three previous complaints filed regarding physical abuse of children at Mother's daycare, but that investigations of those complaints were inconclusive.

Given the evidence indicating that Mother may have caused serious physical harm to Y.M., the Agency concluded that H.T. and his siblings were at substantial risk of emotional and physical harm and if they remained in the care of their parents without services that addressed the protective issues, they would continue to be at substantial risk of emotional and physical harm. Accordingly, the Agency recommended that the court find that it had made a prima facie showing that H.T. was a child described by section 300, subdivision (a) and detain him in out-of-home care.

At a contested detention hearing, the court found a prima facie showing in support of the petition for H.T. had been made by the Agency, but it denied the Agency's request to detain him outside the home. Instead, the court ordered that H.T. and his siblings remain with their parents on the condition that Mother never be left alone with H.T.

In its initial jurisdiction and disposition report, the Agency recommended that the court make a true finding on its section 300, subdivision (a) petition for H.T. and order that he, along with his siblings, be declared dependents of the court, but remain in the care of their parents. It

5

further recommended that family maintenance services be offered to the parents. In addition to her initial opinion, Dr. Nienow opined that because of Y.M.'s serious injuries his behavior would have been noticeably different and he would not have appeared normal during the eight-hour period before the onset of his seizures. Therefore, she believed, with reasonable medical certainty, that his injuries occurred while he was in Mother's care.

In its first addendum report, the Agency stated that Mother was not willing to attend the child abuse classes that it had recommended for her. Mother was adamant that neither she nor Father injured Y.M. Father also denied they had done anything wrong and was also not willing to attend the child abuse classes.

In its third addendum report, the Agency stated that Mother attended an intake appointment for individual therapy and was diagnosed with depression. In July 2019, Mother told an Agency social worker for the first time that an emergency room physician had told her that Y.M. had diabetes and that diabetes caused seizures. Mother also stated she had told Y.M.'s mother to take him to a doctor because he looked as if he were only one month old instead of seven months old.

Due to successive continuances, the court conducted a contested jurisdiction and disposition hearing over seven days from September 2019 through March 2020. At the hearing, the court admitted in evidence the Agency's reports and other documents and heard testimony from Agency social workers Kinnary Jongcharoeun and Laura Koski, Dr. Nienow, San Diego Police Detective Bobby Johnson, Dr. Thomas Grogan, Mother, Father, and other witnesses. Jongcharoeun testified that the Agency ruled out Y.M.'s family as the cause of Y.M.'s injuries because a medical professional had determined his injuries did not occur while in his parents' care, but instead

6

while he was in Mother's care. She had viewed the photograph Mother had taken of Y.M. the morning of March 14 and testified that it showed Y.M. was sitting up straight and appeared to be fine. Jongcharoeun was primarily concerned about the risk Mother posed to H.T. because he was close in age to Y.M. She also described the results of investigations of three prior complaints regarding Mother's daycare and was concerned that all three complaints alleged physical abuse. The first complaint filed on February 26, 2015, alleged that Mother slapped a one-year-old child when she was crying and also grabbed a three-year-old child's face and shook her forcefully. The investigation of that complaint was inconclusive. The second complaint filed on March 9, 2016, alleged that Mother hit a five-year-old child with a metal spoon when he was crying and would not take a nap. The investigation of that complaint initially found that the complaint was substantiated for physical abuse, but was subsequently changed to an inconclusive finding after Mother's appeal. The third complaint filed on August 9, 2016, alleged that Mother had hit children with a spoon and Father had yelled at the children. The investigation of that complaint was inconclusive.

Dr. Nienow testified that she examined Y.M. on March 15, 2019, reviewed his diagnostic scans and other medical records, and spoke with the radiologist, Y.M.'s parents, and investigators of his injuries. Based on that information, she issued a report, dated March 21, 2019, setting forth her findings and opinion. The court admitted a redacted copy of that report. In her opinion, Y.M. was physically abused at Mother's daycare. Y.M. had mixed-density subdural hemorrhages in his brain, an axonal shear injury, cytotoxic edema, an occipital skull fracture, at least one compression fracture of his vertebrae, subdural hemorrhages along his spinal column, and retinal

7

hemorrhages. Y.M.'s injuries were so severe that he would have died without intervention by medical personnel.

Dr. Nienow explained that axonal shear injury is the worst type of brain trauma and can cause unconsciousness. A person could be roused, but would then slip back into unconsciousness, such as how Y.M. did on his arrival at the hospital and for 10 days thereafter. Y.M.'s occipital skull fracture was of the biggest, thickest bone in the skull in the back of his head. Such fractures are relatively rare and require a significant amount of force. She would not expect that Y.M. would have suffered such a skull fracture from a simple fall backward or a short drop or fall from the arm of an average-sized man. Hypothetically, a child in a highchair could sustain such a fracture, along with spinal fractures, if the highchair is shoved or kicked and falls over because there is additional velocity with the extra mass of the highchair. The absence of external injuries at the site of Y.M.'s occipital skull fracture was not a concern to her because 80 percent of all fractures have no external signs of trauma.

Y.M. had a compression fracture at the L-1 spinal column and possibly additional fractures in the thoracic region. That fracture could have been caused by significant axial loading, such as when a child is forcefully slammed down onto his or her buttocks. Alternatively, that fracture could have been caused from flexion-extension, such as when a child is violently shaken. Y.M. had subdural hemorrhaging in his thoracic and lumbar spine, which was likely caused by forced flexion-extension. It was highly unlikely that the abrasion to Y.M.'s top lip, which was actively bleeding and had some scabbing, was caused, as Mother claimed, by wiping saliva from his mouth.

Dr. Nienow opined that it was likely that all of Y.M.'s injuries were caused by the same mechanism, i.e., forced flexion-extension such as from

8

violent shaking or repeated slamming. She believed that Y.M.'s injuries could not have been caused by any prior accidental trauma. Given the timeline information and Y.M.'s injuries, she concluded Y.M was injured at the daycare between 9:10 a.m. and about 2:45 p.m. when he began seizing. Traumatic brain injury that causes axonal shear injury, cytotoxic edema, and subdural hemorrhages is severe and would have an immediate onset of symptoms. Thus, if Y.M. had suffered his skull fracture previously while in his father's care, Y.M. would have been really sick (e.g., lethargy or unconsciousness) such that a regular caregiver would have known something was wrong. Because Y.M. did not have severe symptoms prior to March 14, 2019, and had only an upper respiratory infection with a fever, cough, and runny nose the prior week (and which symptoms had subsided by March 14), Dr. Nienow believed Y.M.'s traumatic brain injuries were sustained on March 14 at Mother's daycare. Dr. Nienow stated that traumatic brain injuries that cause subdural hemorrhages always result in immediate symptoms.

Dr. Nienow reviewed the photograph of Y.M. that Mother sent to Y.M.'s mother at 9:10 a.m. on March 14 and noted that Y.M. was sitting up unassisted and did not appear to be in pain. She stated that if Y.M. had the axonal injury at that time, he would not have been awake, alert, and able to sit unassisted. After his March 14 seizures, Y.M. could not sit unassisted for two months. Contrary to Mother's assertion, Y.M. was not developmentally delayed. Furthermore, Mother's various descriptions of Y.M.'s behavior (e.g., quiet, did not eat much, etc.) before the seizures began did not depict anything abnormal for him. Dr. Nienow further concluded, with reasonable medical certainty, that Y.M.'s postseizure symptoms were not consistent with being shaken by an adult before he was dropped off at daycare on March 14.

9

Agency social worker Koski testified she was concerned that if Mother were left untreated, she would hurt other children. She recommended a plan of family maintenance services for H.T.'s family because he and his siblings had, to date, been safe in the family home. She stated court supervision was necessary to ensure the parents participated in a child abuse parenting group. Koski testified that it was possible that a highly stressed person could snap and abuse a child. She did not believe that Mother and Father would ever admit responsibility for Y.M.'s injuries. Koski believed that the risk to H.T.'s siblings was less than the risk to H.T. because he was young, nonverbal, had no contact with mandated reporters, and his parents were untreated. The fact that H.T. and his siblings had lived injury-free with parents for six months did not change her opinion.

Father testified and denied that he or Mother physically disciplined their children or the daycare children. Although he admitted he did not know whether Mother injured Y.M. while he was out of the home, he insisted Mother would never injure a child. He testified that on March 14, 2019, there were six children at their daycare, all of whom were five years old or younger. He stated that Y.M. was a sick baby and not active like the other children, although he never told Detective Johnson that. Father testified that he had never seen Y.M. sit unassisted.

Dr. Grogan testified as an expert pediatric orthopedist for Mother. After reviewing Y.M.'s imaging scans and other records, but without examining him, Dr. Grogan opined that Y.M.'s injuries were caused by more than one event, but disagreed with Dr. Nienow that all of his injuries likely occurred on March 14, 2019. He believed that Y.M.'s skull fracture was old and that it was possible that a child could suffer a head injury that causes bleeding, which eventually presents as an "acute on chronic subdural"

10

hemorrhage, which he explained meant that some blood is of recent onset and some has been present for some time. He opined that Y.M.'s subdural hemorrhage in his lumbar spine was not associated with his compression fracture. He also believed that Y.M.'s spinal fracture was old because when vertebrae are crushed, they bleed and edema fluid is visible, but no edema fluid was visible on Y.M.'s MRI. He estimated that Y.M. suffered the vertebra compression fracture four to six weeks prior to March 14. He further opined that an occipital fracture could occur if a child were dropped by an adult onto a concrete sidewalk, but it is difficult to determine when a skull fracture occurred. He opined that when a child suffers a skull or vertebrae compression fracture, the child would cry, but then become consolable.

Dr. Grogan further testified that it was possible for a child to suffer a head injury causing bleeding and be depicted as sitting up as Y.M. was in the photograph. The first outward manifestation of such an injury would be seizures, but it was possible for multiple days to pass before a seizure occurred. He did not see any indications of an axonal shear injury on Y.M.'s MRI, such as a lot of edema fluid near the base of his brain as he would have expected, but he could not rule out an axonal shear injury.

Although he agreed with Dr. Nienow that Y.M. suffered a severe traumatic brain injury, he disagreed that a great deal of force was required to inflict that injury. He believed a theory called Second Impact Syndrome could explain Y.M.'s symptoms. He explained that if Y.M. had suffered an earlier brain injury as he believed had occurred, his brain was then sensitized to additional trauma later. Nevertheless, an intentional force would have been required for the type of brain injury Y.M. suffered, such as bouncing his head on the ground or a jarring acceleration and deceleration. Dr. Grogan

11

believed that it could have taken up to 12 hours, but more likely between six to eight hours after that event, for the blood to collect in Y.M.'s brain and cause seizures.

Detective Johnson testified that he had completed his investigation of Y.M.'s injuries. His investigation led to Mother as the cause of Y.M.'s injuries. Mother did not tell him she had a recording of a telephone conversation with Y.M.'s mother until an interview in her attorney's office six days after the incident. Although she had her phone with her, she did not play that recording for him. Because Mother did not provide him with a list of the children who were in her home on March 14, 2019, he was unable to interview any of those children. Although he had obtained Mother's phone through a search warrant, he had not yet been able to review it. After its contents were downloaded, he tried to listen to the phone's recordings, but was unable to hear them.

Mother testified that she obtained from cloud storage her audio recordings that were originally on her cell phone and then forwarded them to her attorney. Those recordings were made in February 2019, which was before Y.M. had his seizures on March 14.

In rebuttal, Dr. Nienow testified that Second Impact Syndrome was a very controversial theory that specifically applied to adolescent athletes. That theory could not be extrapolated to an infant. She disagreed with Dr. Grogan that a lack of bone marrow edema indicated that a spinal compression fracture had to be old. She also disagreed with him that there was "acute on chronic" blood in Y.M.'s spinal column. The subdural hemorrhage in Y.M.'s spinal column was all one color (i.e., bright white) and one age, indicating that it was acute. Dr. Grogan was also incorrect to state that the blood in Y.M.'s spinal column could have come from his brain

12

hemorrhage. If Dr. Grogan were correct, she would have expected to see blood along Y.M.'s spine all the way down to where the hemorrhage was seen, but she did not see any.

After considering the evidence and arguments of counsel, the juvenile court found the allegations in H.T.'s petition to be true, but it dismissed his siblings' petitions. The court found that H.T. was at substantial risk of serious physical harm inflicted nonaccidentally because he was nonverbal and young and because Y.M. was very seriously injured. The court stated:

> "There was a traumatic injury [to Y.M.], and I would make this finding because of [the] immediate onset of symptoms when I look at the evidence as a whole. Something bad happened that day that I believe caused [Mother] to lose her composure, and something bad happened to [Y.M.]. The child almost died."

The court noted that Y.M. was generally healthy when dropped off at daycare, and the photograph taken of him on March 14, 2019, showed that he was not in any distress. The court gave greater credence to the opinions of Dr. Nienow, especially since many of Dr. Grogan's opinions were qualified with words such as "may have," "might be," or "could be." The court found there were two different events involving two different mechanisms that caused Y.M.'s injuries. It found that the evidence strongly supported Dr. Nienow's theory of Y.M.'s axonal shear injury. The court rejected Dr. Grogan's theory that Second Impact Syndrome explained Y.M.'s injuries. The court noted that both Dr. Nienow and Dr. Grogan agreed that Y.M.'s brain injury occurred six to eight hours before his seizures began, which range placed its occurrence more likely less than eight hours before his seizures began. It found that Y.M.'s brain injury was not inflicted before he was dropped off at daycare, because he was in a coma for 10 days after his seizures began and the photograph of him that morning was not consistent

13

with a brain injury occurring before he was dropped off that day. Also, the court noted that it had listened to the recording of Mother's telephone conversation with Y.M.'s mother that occurred before March 14 and described that conversation as jovial with laughing and bantering and without any discussion of Y.M.'s father as being an abuser. Accordingly, the court ordered that it had jurisdiction over H.T. pursuant to section 300, subdivision (a) and declared him a dependent of the court pursuant to section 360, subdivision (d).

In making its dispositional ruling, the court weighed the evidence showing that Y.M. had almost died from injuries inflicted by Mother against the evidence showing that H.T. and his siblings had been okay in the family home for a year since that incident. The court ordered that H.T. remain placed with his parents and ordered that Mother undergo a culturally appropriate psychological evaluation. The court stated that it was not inclined to order Mother to participate in individual therapy or a child abuse class because it doubted Mother would ever admit responsibility for Y.M.'s injuries. The court explained that he allowed the children to remain with the parents over the past year because he trusted Father. It stated the family "appears to be functioning well." The court indicated that if the children remain safe, it would later terminate jurisdiction. The court then set a review hearing for June 2, 2020. Both Mother and Father filed timely notices of appeal challenging the court's jurisdictional and dispositional findings.

DISCUSSION

I

*Substantial Evidence Supports the Court's Jurisdictional Finding*

Mother, joined by Father, contends that the juvenile court erred by finding it had jurisdiction over H.T. because there is insufficient evidence to

14

support a finding H.T. was at a substantial risk of physical harm from Mother or Father.

## A

As a preliminary matter, we note that on October 23, 2020, appellate counsel for Father submitted a letter informing this court she had learned that the juvenile court had terminated its jurisdiction over H.T. on or about September 29, 2020. However, counsel did not file a request for judicial notice of, or otherwise submit a copy of, any such order, stating that her attempts to obtain a copy of the order had been unsuccessful. Father's counsel argues that, assuming arguendo the juvenile court issued an order terminating its jurisdiction over H.T., we should nevertheless exercise our discretion to address the merits of his challenge to the jurisdictional order despite the general rule regarding mootness of an appeal. (See, e.g., *In re N.S.* (2016) 245 Cal.App.4th 53, 58-59; *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431 (*J.K.*).) Likewise, in her reply brief, Mother argues that despite the court's apparent termination of jurisdiction, we should nevertheless address the merits of her challenge to its jurisdictional order. Although the record on appeal does not include a copy of an order of the juvenile court terminating its jurisdiction over H.T., assuming arguendo that the court has so terminated its jurisdiction over H.T., we nevertheless exercise our discretion to review the merits of its jurisdictional order because it could adversely affect Mother and/or Father in the future in matters other than H.T.'s dependency case (e.g., their business or careers). (Cf. *J.K.*, at pp. 1431-1432.)

## B

" 'A dependency proceeding under section 300 is essentially a bifurcated proceeding.' [Citation.] First, the court must determine whether the minor is

15

within any of the descriptions set out in section 300 and therefore subject to its jurisdiction." (*In re Stephen W.* (1990) 221 Cal.App.3d 629, 645.) Section 300, subdivision (a) provides that a child is within the jurisdiction of the juvenile court and may be adjudged a dependent child of the court if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . ." Section 300, subdivision (a) further provides that "a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and *other actions by the parent . . .* that *indicate the child is at risk of serious physical harm*." (Italics added.)

A section 300 petitioner has the burden to prove by a preponderance of the evidence that the child is subject to the court's jurisdiction. (§ 355, subd. (a); *In re Brison C.* (2000) 81 Cal.App.4th 1373, 1379.) Under section 300, the court considers the circumstances at the time of the jurisdictional hearing in determining whether the child is at risk of harm. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1134.) "A juvenile court need not wait until a child is seriously abused or injured before it takes jurisdiction under section 300, subdivision (a), and the court may consider past events in deciding whether a child currently needs its protection." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 138 (*Isabella F.*).) Also, a court may make a finding of jurisdiction over a child if the actions of either parent bring the child within the provisions of section 300, subdivision (a). (*In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.)

On appeal, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings. (*Isabella F., supra*, 226

16

Cal.App.4th at p. 137.) In so doing, we consider the entire record, view the evidence and draw all reasonable inferences therefrom in favor of the prevailing party, and then affirm the order if substantial evidence supports the court's findings. (*Id.* at pp. 137-138; *In re Shelley J.* (1998) 68 Cal.App.4th 322, 329 (*Shelley J.*).) Substantial evidence does not mean "any" evidence, but only that evidence which is reasonable, credible, and of solid value. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 564.) We do not consider the credibility of the witnesses or reweigh the evidence. (*Isabella F.*, at p. 138.) A finding is supported by substantial evidence if a trier of fact could reasonably make that finding in light of the entire record. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.) We must affirm an order that is supported by substantial evidence even if other evidence, or other inferences from the evidence, would have supported a contrary finding. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168 (*N.M.*).) On appeal, the parent has the burden to show there is insufficient evidence to support the juvenile court's order. (*Ibid.*)

C

Based on our review of the record on appeal, we conclude there is substantial evidence to support the juvenile court's finding that it had jurisdiction over H.T. pursuant to section 300, subdivision (a). First, the evidence strongly supports a finding that Mother nonaccidentally inflicted serious, and nearly fatal, physical injuries on Y.M. while in her care. In a photograph taken by Mother and sent to Y.M.'s mother at about 9:10 a.m. on March 14, 2019, Y.M. was sitting up unassisted and appeared to be fine. The court found Dr. Nienow to be credible and gave her testimony more weight than Dr. Grogan's testimony. Based on Dr. Nienow's testimony, the court could reasonably find that if Y.M. had suffered his serious brain trauma and

other injuries prior to being dropped off at Mother's daycare, he would have been crying and in severe pain and would not have been able to sit unassisted and appear fine as shown in the photograph. Furthermore, Dr. Nienow testified that neither Y.M.'s illness the previous week nor his father's possible dropping him the prior month (as Mother claimed) could have caused Y.M.'s serious, near-fatal injuries or the seizures that he began suffering at 2:45 p.m. that day. Dr. Nienow testified that a traumatic brain injury severe enough to cause an axonal shear injury, cytotoxic edema, and intracranial hemorrhages would have an immediate onset of symptoms, including unconsciousness. Most importantly, Dr. Nienow opined that, with reasonable medical certainty, Y.M.'s injuries were the result of physical abuse inflicted while he was at Mother's daycare on March 14 and, specifically, between 9:10 a.m. and 2:45 p.m. that day. Because the undisputed evidence showed that Father was not at home shortly before or at the time of Y.M.'s seizures, the court reasonably inferred that Mother had physically abused Y.M., causing his serious, near-fatal injuries.

Second, given its finding that Mother physically abused Y.M. and caused his serious, near-fatal injuries, the court could further reasonably find that a preponderance of the evidence showed that Mother posed a substantial risk to H.T. of serious physical harm inflicted nonaccidentally. (§ 300, subd. (a).) The court expressly noted that H.T. and his siblings had been safely cared for by their parents in the family home during the one-year period preceding its jurisdictional finding. Despite the apparent absence of any physical abuse of H.T. or his siblings during that period, the court could reasonably find that Mother nevertheless posed a substantial risk to H.T. from the time of the dependency petition filing through the date of its jurisdictional finding. Throughout H.T.'s dependency proceedings, Mother

18

continued to deny she had injured Y.M. and had received little, if any, treatment or services that would address whatever problems that may have caused her to injure Y.M. and that might potentially cause her to injure other infants, such as H.T., in the future. Likewise, Father continued to deny that Mother had injured Y.M. and had received no treatment or services. Furthermore, Koski testified that she remained concerned that H.T. continued to be at high risk of serious physical harm inflicted by Mother. She testified that a person who could snap and inflict severe injuries, such as those suffered by Y.M., could abuse another child. In particular, Koski noted that H.T., like Y.M., was very young, nonverbal, and had no contact with mandated reporters. The court expressly found that H.T. was at substantial risk of serious physical harm inflicted nonaccidentally because he was nonverbal and young and because Y.M. was very seriously injured. In opposition, Mother and Father did not present any expert opinion testimony that they no longer posed a substantial risk of serious physical harm to H.T. Given the evidence showing that Mother physically abused Y.M. and caused his serious, near-fatal injuries and Koski's testimony that H.T. was at substantial risk of serious physical injury, we conclude that the court could reasonably find that Mother posed a substantial risk to H.T. of serious physical harm inflicted nonaccidentally. (§ 300, subd. (a).)

Mother, joined by Father, cites certain evidence, and inferences therefrom, that could have supported a contrary finding by the court. However, in so doing, they misconstrue and/or misapply the substantial evidence standard that we apply in reviewing the court's jurisdictional findings. (*Isabella F.*, *supra*, 226 Cal.App.4th at pp. 137-138; *Shelley J.*, *supra*, 68 Cal.App.4th at p. 329.) As stated *ante*, we must affirm an order that is supported by substantial evidence even if other evidence or other

19

inferences therefrom would have supported a contrary finding. (*N.M.*, *supra*, 197 Cal.App.4th at p. 168.) Furthermore, it is not our function on appeal to consider the credibility of the witnesses or reweigh the evidence. (*Isabella F.*, *supra*, 226 Cal.App.4th at p. 138.) Accordingly, the reliance by Mother and Father on Dr. Grogan's opinions, including his suggestions that Y.M.'s injuries or seizures could be explained by a previous dropping or highchair accident or by the theory of Second Impact Syndrome, which suggested explanations were not accepted by the juvenile court, do not show there is insufficient evidence to support the court's jurisdictional findings.[6] In particular, to the extent they argue there is evidence showing that Y.M.'s father dropped Y.M. during the month prior to his seizures and may have caused his skull fracture or that Y.M. had been ill the prior week, the court reasonably found that evidence did not refute Dr. Nienow's opinions that Y.M.'s injuries were nonaccidentally inflicted at Mother's daycare on March 14, 2019, and not at any time prior thereto.

Likewise, Mother's and Father's citation of evidence showing that they had not physically abused H.T. or his siblings during the pendency of H.T.'s dependency case does not show there is insufficient evidence to support the court's finding that H.T. nevertheless remained at substantial risk of serious physical harm by Mother at the time of its jurisdictional order. The fact that H.T. had not been physically abused by Mother during his dependency proceedings does not, in and of itself, prove such physical abuse could not recur such that H.T. was no longer at substantial risk of serious physical

---

[6] In particular, the court presumably accepted Dr. Nienow's testimony that it was "a little bit implausible" that a highchair accident caused Y.M.'s injuries. Furthermore, Mother told the Agency that Y.M. had not suffered any accidents or falls (e.g., fall from a highchair) at her daycare on March 14, 2019, and did not tell it that she had placed Y.M. in a highchair that day.

harm.[7] (*In re I.J.* (2013) 56 Cal.4th 766, 773 [§ 300 "does not require that a child actually be abused or neglected" and therefore "court need not wait until a child is seriously abused or injured to assume jurisdiction"]; *In re R.V.* (2012) 208 Cal.App.4th 837, 843 [same]; cf. *In re C.V.* (2017) 15 Cal.App.5th 566, 572 [three-month-old child was not at substantial risk of serious physical harm because he was incapable of reaching or accessing unloaded shotgun that his parents stored in backpack wedged between mattress and bedroom wall and incident was unlikely to recur].)

As noted *ante*, throughout H.T.'s dependency proceedings, Mother denied that she had injured Y.M. Also, Mother had received little, if any, treatment or services that would address whatever problems she may have that caused her to injure Y.M. and may potentially cause her to injure other infants or young children, such as H.T., in the future. Likewise, although the court believed H.T. would be safe while Father was present in the home, Father was not always in the home, continued to deny that Mother had injured Y.M., and had received no treatment or services. The court could reasonably infer that given the parents' continued denial that Mother inflicted serious injuries on Y.M., there remained a substantial risk to H.T. that Mother could inflict serious physical injuries on him. As Koski testified,

_____

7    Contrary to Mother's apparent assertion, we conclude that *In re A.G.* (2013) 220 Cal.App.4th 675 is factually inapposite to this case because the court here found that Mother had inflicted serious, near-fatal injuries on Y.M. and she continued to deny inflicting those injuries and had received little, if any, services to address what, if any, problems caused her to physically abuse Y.M. Therefore, *In re A.G.* does not persuade us to reach a contrary conclusion. Likewise, none of the other cases cited by Mother are factually apposite to this case or otherwise persuade us to reach a contrary conclusion. (See, e.g., *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 727; *In re David M.* (2005) 134 Cal.App.4th 822, 829-830; *In re J.N.* (2010) 181 Cal.App.4th 1010, 1026.)

H.T. continued to be at high risk of serious physical harm inflicted by Mother, noting that H.T., like Y.M., was very young, nonverbal, and had no contact with mandated reporters. Contrary to Mother's and Father's assertion, the fact that H.T. was about two and one-half years old at the time of the court's jurisdictional order and Y.M. was a seven-month-old infant at the time he was physically abused by Mother, does not show there is insufficient evidence to support the court's finding that H.T. was at substantial risk of serious physical injury inflicted by Mother. Furthermore, Mother's and Father's citation to Mother's educational and professional background and the testimony of her character witnesses does not prove that she could not pose a substantial risk of inflicting serious physical harm on H.T. in the future.

## II

*Substantial Evidence Supports the Court's Dispositional Order*

Mother, joined by Father, contends the juvenile court abused its discretion by issuing a dispositional order requiring Mother to undergo a psychological evaluation.

## A

As a preliminary matter, we again note that on October 23, 2020, Father's appellate counsel submitted a letter informing this court she had learned that the juvenile court had terminated its jurisdiction over H.T. on or about September 29, 2020. However, counsel did not file a request for judicial notice of, or otherwise submit a copy of, any such order. In Mother's reply brief, she notes the court's apparent termination of jurisdiction and concedes that her contention that the dispositional order is erroneous is now moot. We accept her concession, which we presume is joined by Father, and agree that their challenge of the court's dispositional order is moot because we cannot now provide any effective relief. (Cf. *N.S.*, *supra*, 245 Cal.App.4th

22

at pp. 58-59; *J.K.*, *supra*, 174 Cal.App.4th at p. 1431.)  Therefore, we need not address the merits of this contention.

B

Assuming arguendo that the court has terminated its jurisdiction over H.T. and that its dispositional order could adversely affect Mother in the future in matters other than H.T.'s dependency case or is otherwise not moot (cf. *J.K.*, *supra*, 174 Cal.App.4th at pp. 1431-1432), we nevertheless conclude the court did not abuse its discretion by ordering Mother to undergo a psychological evaluation.

After a juvenile court finds that it has jurisdiction over a child and declares a child a dependent of the court, it has discretion to issue a dispositional order based on its determination of what services the child and family may need to be free of court supervision.  (§ 362, subd. (a); *In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345-346.)  Section 362, subdivision (a) provides that a court "may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . ."  Accordingly, a court has broad discretion in issuing a dispositional order based on its determination of a child's best interests, including ordering case plan services, such as a plan of family maintenance.  (See, e.g., *In re Briana V.* (2015) 236 Cal.App.4th 297, 311-312 (*Briana V.*); *In re J.P.* (2017) 14 Cal.App.5th 616, 625-626 (*J.P.*).)  In particular, the court may "direct any reasonable orders to the parents" of the child "as the court deems necessary and proper."  (§ 362, subd. (d).)  For example, after a court finds it has jurisdiction over a child, the court may order a psychological evaluation to ascertain the cause and extent of any mental illness suffered by a parent that may have led to a child's dependency.  (Cf. *Laurie S. v. Superior Court* (1994)

23

26 Cal.App.4th 195, 202-203 (*Laurie S.*).) "The psychological evaluation is an 'information-gathering tool.' " (*Id.* at p. 202.)

On appeal, we apply the abuse of discretion standard in reviewing a juvenile court's dispositional order regarding family maintenance services. (*Briana V.*, *supra*, 236 Cal.App.4th at pp. 311-312; *J.P.*, *supra*, 14 Cal.App.5th at pp. 625-626.) In applying the abuse of discretion standard of review, we will not disturb a court's exercise of discretion unless it exceeds the bounds of reason and makes an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319 (*Stephanie M.*); *In re Raymundo B.* (1988) 203 Cal.App.3d 1447, 1456.) Accordingly, when two or more inferences can reasonably be deduced from the facts, we cannot substitute our decision for that of the juvenile court. (*Stephanie M.*, at p. 319.)

Based on our review of the record, we conclude the court did not abuse its discretion by ordering Mother to undergo a psychological evaluation. Although the evidence showed, as the court found, that Mother caused Y.M.'s injuries, there was little, if any, evidence showing what prompted Mother to do so. Therefore, after assuming jurisdiction over H.T., because his parents had theretofore declined voluntary services offered to them, the court reasonably sought further information regarding what caused Mother to injure Y.M. and, more importantly, what, if any, treatment could be offered her so that she would no longer pose a substantial risk of serious physical harm to H.T. In seeking such information, the court reasonably ordered that Mother undergo a psychological evaluation, as an information-gathering tool, to ascertain the cause and extent of any mental illness from which she may suffer or any other treatable factors that may have caused her to physically abuse, and inflict near-fatal injuries on, Y.M., in order to give the court

24

information on which it could base future specific orders for treatment or other services such that she would no longer pose a substantial risk of serious physical harm to H.T.  (Cf. *Laurie S.*, *supra*, 26 Cal.App.4th at pp. 202-203.) By so ordering Mother to undergo a psychological evaluation, we conclude the court did not abuse its discretion.  (*Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *Briana V.*, *supra*, 236 Cal.App.4th at pp. 311-312; *J.P.*, *supra*, 14 Cal.App.5th at pp. 625-626; cf. *Laurie S.*, at pp. 202-203.)

Mother and Father have not carried their burden on appeal to show otherwise.  Contrary to their apparent assertion, the fact that the court did not initially order specific family maintenance services in its dispositional order, did not preclude it from inquiring further into the genesis of why Mother physically abused Y.M. and what specific family maintenance services, if any, could be offered to Mother that could protect H.T. from the substantial risk of serious physical harm that she posed to him.  Even in the absence of any evidence at the time of the dispositional hearing showing that Mother had a mental illness, the court could nevertheless reasonably seek evidence of any such illness or other causation factors as part of its information-gathering process in determining what family maintenance services were in H.T.'s best interests.  Contrary to Mother's and Father's assertion, the court was not required to dismiss the petition and/or terminate its jurisdiction simply because it did not have such evidence at the dispositional hearing.

DISPOSITION

The orders are affirmed.


                                        McCONNELL, P. J.


WE CONCUR:


HUFFMAN, J.


GUERRERO, J.